1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FELIX MANUEL BERMUDEZ, ) | 1:04-CV-5108 OWW SMS HC |
| ) | |
| Petitioner, ) | FINDINGS AND RECOMMENDATION |
| ) | REGARDING PETITION FOR WRIT OF |
| v. ) | HABEAS CORPUS |
| ) | |
| JOE McGRATH, ) | |
| ) | |
| Respondent. ) | |
| _____ ) | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254.

**PROCEDURAL BACKGROUND**[1]

Petitioner is currently in the custody of the California Department of Corrections pursuant to

a judgment of the Superior Court of California, County of Kern, following his conviction by jury

trial on March 14, 2001, of four counts of assault with a firearm (Cal. Penal Code § 245(a)(2)), four

counts of attempted robbery of an inhabited dwelling (Cal. Penal Code §§ 664, 212.5), and discharge

of a firearm at an inhabited dwelling (Cal. Penal Code § 246). See Exhibits A, C, Respondent's

Answer to the Petition (hereinafter "Answer"). On April 11, 2001, Petitioner was sentenced to serve

a total determinate term of twenty-three years and four months in state prison. Id.

---

[1]This information is derived from the petition for writ of habeas corpus, Respondent's answer to the petition, and the exhibits submitted in support of Respondent's answer.

1   Thereafter, Petitioner filed a notice of appeal with the California Court of Appeal, Fifth

2   Appellate District (hereinafter "5th DCA"). On October 1, 2001, the 5th DCA issued an unpublished

3   opinion affirming the judgment. See Exhibit C, Answer.

4   Petitioner filed a petition for writ of habeas corpus in the California Supreme Court on

5   November 25, 2002. See Exhibit D, Answer. On April 9, 2003, the petition was denied with citation

6   to In re Waltreus, 62 Cal. 2d 218 (1965). See Exhibit E, Answer.

7   On January 5, 2004, Petitioner filed the instant federal habeas petition in this Court.

8   Petitioner raises two grounds for relief: 1) Petitioner claims the trial court erred in refusing to grant

9   Petitioner's motion for mistrial based on a prospective juror's comments regarding Officer Madden;

10   and 2) Petitioner claims there was insufficient evidence to support the Forest Avenue conviction.

11   On July 7, 2004, Respondent filed an answer to the petition. Respondent contends that

12   Petitioner has procedurally defaulted his claims. He further alleges the claims are without merit.

13   On August 9, 2004, Petitioner filed a traverse.

14   **FACTUAL BACKGROUND**

15   **Prosecution - Brockton Court crimes**

16   On October 11, 2000, at around 8:45 p.m., Fred Eckles was at his home at 5117 Brockton

17   Court in Bakersfield. (RT[2] 47-48.) He was watching a game with his friends, Kniela Inouye (aka

18   "Corn") and Luis Sandoval. (RT 48-49, 582.) His roommate, Kiki, was in the back bedroom. (RT

19   50.) Eckles heard a car door slam and looked through the window to see who it was. (RT 50.) He

20   saw a burgundy-colored two-door sports car, though he was not sure of the make and model. (RT

21   51.) He saw a male and a female exit the vehicle. (RT 51.) The two people knocked on the side door

22   near the kitchen, and Eckles opened it approximately half a foot. (RT 53, 56-57.) Corn had gone to

23   the door as well and was standing near Eckles. (RT 58.)

24   Eckles saw and recognized the female. (RT 53.) She was black, short, bald, chunky, and had

25   a round face. (RT 53.) He knew her to go by the name of "Smoke." (RT 53.) Smoke had been to the

26   house before and had purchased Ecstasy from his roommate, Alex Qualls. (RT 56.) Smoke asked to

27

28   _____

[2]"RT" refers to the Reporter's Transcript.

see Qualls. (RT 56.) Eckles told her to wait, because Qualls was not present, but his friend Corn would sell drugs in Qualls' absence. (RT 57.) Corn then passed by Eckles and stood outside the doorway. (RT 60.) At that point, Eckles heard a male voice say, "Lay your punk ass down." (RT 58.) He saw a man through the crack in the door holding a gun. (RT 58.) He described the person as a black male approximately 6' 2" tall wearing a wide-brimmed fishing hat and a hooded sweatshirt with black sleeves and white on the front. (RT 59, 62.) He recognized the person to be someone he knew as Felix who often "hung out" with Smoke. (RT 65.) Eckles identified Petitioner in court to be that person. (RT 66.)

When Eckles looked through the crack in the door he saw Petitioner pointing the gun at Corn. (RT 59.) Corn then turned and ran back inside the house and Petitioner slammed the door shut. (RT 58-60.) Eckles heard three gunshots, and he ran to the back of the house and climbed out the back window along with Corn and Luis. (RT 61.) Eckles admitted that he had initially told officers that Petitioner was a thin, clean-shaven male in his 20's , approximately 5' 10" tall, 145 pounds, having short black hair and dark complexion. (RT 61-62.) He had also described Petitioner as wearing a gray T-shirt and baggy blue jeans. (RT 62.)

When Eckles returned home that night, he found two bullet holes in the front door and one in the front of the house. (RT 63.) At some point thereafter, Eckles contacted Officer Clay Madden of the Bakersfield Police Department. (RT 70.) Eckles knew Madden as they had played basketball together for several years. (RT 71.) Eckles told Madden that Smoke and Petitioner had committed the shooting. (RT 71.) Eckles told Madden he would cooperate with the investigation and testify at trial. (RT 72.) Approximately three to five days later, Madden contacted Eckles and showed him a photographic lineup. (RT 73.) Eckles looked at the lineup and identified Petitioner as the shooter. (RT 74-75.) Approximately three to four days after Eckles identified Petitioner, someone contacted Eckles' roommate wanting to make a deal with Eckles regarding his identification of Petitioner. (RT 75-76.) In November of that year, Eckles went to an in-person lineup but did not identify Petitioner as the shooter. (RT 76-77.) Based on his subsequent conversations with Corn, Eckles recanted his identification stating he no longer believed Petitioner was the shooter. (RT 77.)

Kniela Inouye, aka "Corn," testified he was at Eckles' home on October 11, 2000. (RT 111.)

He recalled that he, Eckles, and Luis had just finished watching a basketball game when he heard a car pull up to the house and someone knock on the side door. (RT 112.) Eckles answered the door and Corn went out. (RT 112.) He turned to the right and saw a man pointing a gun at his face. (RT 113.) He also saw a female who he described as black, short, "kinda chunky," and having a short haircut. (RT 114.) He recognized her as someone he had seen before. (RT 113-114.) He described the male as taller than himself, approximately 5' 9" to 5' 10" tall. (RT 114.) As the male held the gun at approximately 6 to 7 inches from Corn's face, the male said, "Lay your bitch ass down." (RT 115.) Corn then turned around and went back into the house. (RT 115.) Corn did not recognize the man. (RT 115.) As Corn went through the door, Eckles slammed the door on the male. (RT 116.) Corn then turned to run and heard three gunshots. (RT 117. ) Corn fell as he was running and he heard one of the bullets pass over his head. (RT 117.) Corn ran to the back of the house and followed Eckles out of the back window. (RT 118.) Corn sustained injuries to his lip during his escape. (RT 118.)

Bakersfield Police Officer Ryan Floyd responded to the shooting on October 11 and made contact with Eckles, Corn and Luis. (RT 582-584, 588.) Corn and Luis were not able to provide descriptions of the suspects. (RT 589.) However, Eckles was able to provide a description. (RT 589.) Eckles stated the suspects were a black male and black female. (RT 589.) He stated the male suspect possessed a gun. (RT 589.) Officer Floyd stated Eckles had recognized the suspects from seeing them on prior occasions in the area of Third and Texas streets. (RT 590.) Eckles told Officer Floyd that someone had told him the male suspect's name was Felix. (RT 590.) Officer Floyd recovered two 9-millimeter Luger shell casings at the location. (RT 592-594.) He located two gunshot holes in the door and one gunshot hole in the plaster of the house. (RT 594-596.)

Bakersfield Police Officer Clay Madden was assigned the investigation of the case. (RT 296.) On October 24, 2001, Madden re-interviewed Eckles about the crime. (RT 296.) Eckles stated he knew who the shooter was, he provided Madden with Petitioner's name, and he stated he was willing to cooperate in the investigation. (RT 296-297.) Madden conducted a photo lineup on October 27. (RT 301.) Eckles identified Petitioner as the shooter from a photograph in the lineup. (RT 303.) He stated he was positive it was Petitioner because he had seen him on several occasions at parties. (RT 305.) Corn could not make an identification because he had been focusing on the gun. (RT 305.)

1    Thereafter, Petitioner was arrested, and Officer Madden interviewed him. (RT 312-313.)

2    Petitioner agreed to speak to Madden. (RT 314-315.) Madden explained to Petitioner that he had

3    been identified as the shooter at the Brockton Court incident. (RT 315.) Petitioner stated he did not

4    know anything about the incident. (RT 315.) Madden asked Petitioner if he knew Eckles, and

5    Petitioner stated he did not. (RT 315.) Madden asked if Petitioner had ever been to the Brockton

6    Court residence, and he stated he had not. (RT 315.) Madden then asked Petitioner if he knew a

7    woman who went by the name of "Smoke." (RT 317.) Petitioner stuttered and responded he did not

8    know who Madden was talking about. (RT 317.) Madden told Petitioner that he must know who he

9    was talking about because Madden himself had contacted the two of them together on a prior

10   occasion. (RT 317.) Petitioner though for a moment and asked Madden if he was talking about "the

11   female." (RT 317.) Petitioner stated he did know her and described her as a black female around 16

12   or 17 years old who resembled a male. (RT 318.) He also said she was short and fat. (RT 318.) He

13   stated he believed she was currently in juvenile hall, and he hadn't spoken to her in some time. (RT

14   318.)

15   Madden went to juvenile hall and interviewed Smoke. (RT 331.) She initially stated she did

16   not know anything about the incident, but had heard that Petitioner was responsible. (RT 332.)

17   Madden then told her, as a ruse, that she and Petitioner had been positively identified by the victims.

18   (RT 332.) She responded by saying, "I can't believe he got me involved in this. I was there, but I

19   didn't do anything." (RT 332.) During the course of the interview, Madden did not provide Smoke

20   with any details of the crime. (RT 332.)

21   Smoke stated she met up with Petitioner on October 11 at Central Cali Liquor. (RT 336.) She

22   stated that at Petitioner's suggestion, they agreed to go to the Brockton Court residence to purchase

23   marijuana. (RT 336, 342.) She told Petitioner she did not have any money, and he told her not to

24   worry about it. (RT 336.) They then got into a burgundy 1991 Buick Skylark. (RT 336.) She said she

25   had never seen the car before. (RT 337.) Petitioner was very quiet in the car, which was not typical

26   of him. (RT 343.) When they arrived at the Brockton Court residence, Petitioner got out of the

27   vehicle, told Smoke to stay in the car, picked up a black fisherman's hat, and started heading to the

28   residence. (RT 343.) As he neared the residence, he pulled the hat down over his face. (RT 343.)

1    Thinking he was going to fight someone, Smoke exited the vehicle as well. (RT 343.) Petitioner

2    approached the kitchen door and knocked. (RT 344.) Smoke was standing next to Petitioner. (RT

3    344.) When Eckles opened the door, Petitioner pointed the gun at him and told him to "lay down" or

4    "lay your ass down." (RT 345.) Eckles then shut the door, and Petitioner began firing his gun into the

5    door. (RT 345.) Smoke then ran to the car and got inside. (RT 345.)

6         Renee Dean (aka "Smoke") testified at trial that she saw Petitioner in a burgundy Buick

7    Skylark at Central Cali Liquors. (RT 209, 211-212.) She had never seen him in that car before. (RT

8    212.) Petitioner struck up a conversation with her. (RT 213.) They had been in an argument a few

9    weeks before over some compact discs. (RT 213.) Prior to that argument, they had been friends and

10   would often spend time together either traveling around or smoking marijuana. (RT 213.) She

11   recalled that on two or three prior occasions, Officer Madden had contacted the two of them when

12   they were together. (RT 214.)

13        On this occasion, Smoke and Petitioner resolved their differences. (RT 215.) They decided to

14   obtain a bag of marijuana to smoke it together. (RT 215.) Petitioner suggested they purchase $20

15   worth of marijuana from a house on Brockton Court, and Smoke agreed. (RT 216, 218-219.) Smoke

16   stated they had purchased drugs there approximately four to five times before from someone she

17   knew as "Q." (RT 216.) She remembered seeing someone she knew as Fred there on those occasions.

18   (RT 217.) She stated Petitioner had been to the house on several occasions as well. (RT 218.) She

19   testified she was wearing jean shorts, a blue-green sweater, and a blue and gray LA Dodgers hat. (RT

20   220.) Her hair was very short and bald on the sides. (RT 221.) Petitioner was wearing a black jersey

21   and pants. (RT 221.)

22        When they arrived at the Brockton Court residence, Petitioner told Smoke to stay in the car;

23   normally, she would accompany him to the door. (RT 221.) Petitioner retrieved a black fisherman's

24   hat from the seat and put it on. (RT 223.) As Petitioner approached the house, Smoke exited the

25   vehicle out of curiosity. (RT 223.) Petitioner approached the side door. (RT 225.) Her pager went off

26   as she was walking up the driveway. (RT 226.) When she looked up, she saw Petitioner standing at

27   the door with a chrome/silver gun. (RT 227.) She then heard Petitioner say, "Everybody lay down."

28   (RT 228.) After that, she heard four gunshots. (RT 228.) She then ducked and ran back to the car.

1   (RT 229.) Petitioner got into the vehicle as well. (RT 229.) She asked Petitioner what had happened,

2   and Petitioner stated, "I was going to rob 'em." (RT 229.)

3          **Prosecution - Forest Street Crimes**

4          On the same night as the Brockton Court incident, a similar incident took place at an

5   apartment located on Forest Street a few miles from Brockton Court in Bakersfield. (RT 130.)

6          Jeanette Gomez lived in an apartment located at 1824 Forest Street. (RT 130.) She lived there

7   with her two sons, Arthur and Joseph. (RT 131.) She lived next door to her mother, her daughter,

8   and her nieces. (RT 132.) On the night in question, ahe was bathing her son Arthur in the bathroom

9   when her daughter, Vanessa, came in and asked to borrow a blow dryer. (RT 133.) When Jeanette

10  came out of the restroom, she saw a female in the living room. (RT 133.) The female was black,

11  around 19 years old, and had short hair. (RT 134-135.) A male then came into the living room from

12  the kitchen. (RT 136.) Jeanette asked the female what she was doing in the apartment but she did not

13  respond. (RT 136.) The male then said, "Give me your money, bitch." (RT 137.) She told him she

14  didn't have any money, and he told her again, "Give me your money, bitch." (RT 137.) He then

15  slapped her and pulled out a gun. (RT 137.) She began to cry, pleading with him not to hurt her or

16  the kids. (RT 137.) He pointed the gun approximately two inches from her head. (RT 137-138.) He

17  told her if she didn't give him any money, he would "smoke [her] away." (RT 138.)

18         At trial, Jeanette identified Petitioner as the perpetrator. (RT 139.) She had never seen him

19  prior to that incident. (RT 139.) She recalled he was wearing a gray shirt with gray khakis along with

20  a bandanna which covered his mouth. (RT 140.) She could clearly see the rest of his face. (RT 141.)

21  During the incident, Jeanette's niece came in and saw something was wrong, so she left and called

22  911. (RT 141.) The female who had come in with Petitioner attempted to chase the niece down. (RT

23  141, 168-169.)

24         Vanessa Gomez testified she went into her mom's house to borrow a blow dryer. (RT 172.)

25  She went into the bathroom to get the dryer, and when she came out of the bathroom with her

26  mother, Petitioner and Smoke were standing inside the apartment. (RT 172-173.) Petitioner was

27  wearing a blue bandanna on his face, and he wore a dark blue hat. (RT 174.) The bandanna covered

28  his lips, but his nose and eyes were visible. (RT 174.) She testified Petitioner then told her mother,

1    "Give me the money, bitch." (RT 175.) Petitioner was pointing a gun at her and her mother. (RT

2    175.) Petitioner also told Vanessa's mother, "I'm going to smoke you away." (RT 176.) Vanessa's

3    cousin Monica then looked into the room. (RT 178.) Petitioner then pointed the gun at Monica and

4    told her, "Give me the money, bitch." (RT 179.) Monica then ran from the room. (RT 179.) Smoke

5    tried to chase her down but didn't catch her. (RT 178.) When Smoke returned, she said something to

6    Petitioner and they both left. (RT 178.) She saw them leave in a vehicle. (RT 181.) It was dark

7    outside, but she thought the car was either black or burgundy in color. (RT 181.) She remembered

8    telling the officers it was a burgundy car. (RT 181.) Vanessa identified Smoke from a lineup as the

9    woman who was with Petitioner. (RT 184.) She could not identify Petitioner because the bandanna

10   and hat covered much of his face. (RT 185.)

11        At approximately 9:05 p.m., Bakersfield Police Officer Joel Loera responded to the Forest

12   Street apartment. (RT 203-204.) Loera stated Jeanette and Monica provided him with a description

13   of the male suspect. (RT 205.) They described him as a black male, 19 to 20 years old, five foot ten,

14   175 pounds, wearing a tan long sleeve jersey, blue jeans, and a bandanna around his face. (RT 205.)

15   Vanessa told him the suspects left in a compact burgundy four-door vehicle. (RT 207.)

16        Officer Madden interviewed Smoke about the Forest Street crimes at juvenile hall. (RT 347.)

17   Smoke told him it was her idea to go to the Forest Street apartment to obtain drugs. (RT 348.)

18   Madden stated Smoke told him that she had asked Petitioner to stay in the car when they arrived at

19   the address, because she did not want Petitioner to do what he had done at the Brockton Court

20   address. (RT 347-348.) When she arrived at the Forest Street address, she initially went to the wrong

21   apartment. (RT 348-349.) Upon realizing she was at the wrong apartment, she then went to the front

22   apartment. (RT 348-349.) She told Madden she knocked on the front door and Vanessa answered.

23   (RT 349, 351.) At Vanessa's invitation, Smoke entered the apartment and closed the door. (RT 350.)

24   Petitioner then opened the door and entered wearing a blue bandanna over the lower portion of his

25   face. (RT 351.) When Petitioner entered, he pointed a gun at Vanessa and Vanessa's mother and told

26   them, "Lay down, bitch." (RT 352.) Another Hispanic female then came into the apartment, and

27   Petitioner pointed the gun at her telling her, "Come here, bitch." (RT 353.) The female ran from the

28   apartment. (RT 354.) Then, Smoke and Petitioner left the apartment. (RT 354.) They departed in

Petitioner's vehicle, and Petitioner dropped Smoke off at her girlfriend's house. (RT 355.) Smoke described the gun to Madden as a small chrome gun, either a .22 or .25 caliber automatic. (RT 355.)

Smoke testified that after she and Petitioner left Brockton Court, they went to the Forest Street apartment to obtain marijuana. (RT 230.) She stated it was her idea to go there and that Petitioner had never been to that apartment. (RT 231.) She admitted she had purchased marijuana from a middle-aged Hispanic lady at that apartment on three prior occasions. (RT 232.) When they arrived at the Forest Street address, Smoke told Petitioner to stay in the car, because she didn't want him to do what he had done at the Brockton Court residence. (RT 235.) Smoke knocked on the side door and a lady answered. (RT 237.) When Smoke asked to purchase marijuana, the lady told her to go to the front apartment. (RT 237.) Smoke then went to the front apartment and knocked on the door. (RT 237.) A teenage girl answered the door, and Smoke asked to purchase marijuana. (RT 237.) The girl asked her to wait inside the apartment. (RT 237.) At this point, Petitioner pushed past Smoke and entered the apartment. (RT 237.) The Hispanic woman that Smoke had purchased marijuana from in the past emerged from another room, and Petitioner shouted for everyone to "lay down." (RT 238.) Petitioner had a blue bandanna over his face and a hat pulled down across his head. (RT 239.) Petitioner pointed his gun at the woman and the teenager, and Smoke ran out of the room. (RT 239.) Smoke remembered seeing the woman she had initially made contact with poke her head in to see what was occurring. (RT 240.) The woman let out a small scream and ran away. (RT 240.) Smoke ran to the car and got in. (RT 241.) Approximately sixty seconds later, Petitioner emerged from the apartment and got into the car. (RT 241.) They drove away, and Smoke demanded that Petitioner let her out of the vehicle because she was angry at what he had done. (RT 242.) At Chester and Fourth Streets, Petitioner let Smoke out of the vehicle. (RT 242.) Smoke stated she agreed to testify against Petitioner in return for a reduction in her sentence from five years to three years. (RT 251.)

Smoke testified that Petitioner had been involved in gang activity. (RT 256.) She personally witnessed one occasion when Petitioner struck a member from a rival gang. (RT 257.)

**Defense**

Fontaine Sherman was a close friend of Petitioner, and he provided an alibi for him. (RT

390.) He testified that he and Petitioner had traveled to Las Vegas on October 8 and returned on October 10. (RT 391.) At approximately 8:00 a.m., on October 11, Fontaine contacted Petitioner and asked him to return a rental truck to Fontaine so Fontaine could then return it to the rental company. (RT 392-393.) About 15 to 20 minutes later, Petitioner showed up at Fontaine's house in the white Ford F-150 rental truck. (RT 393-394.) Fontaine also testified that Petitioner owned a blue Chevrolet Impala which he had purchased from Fontaine. (RT 394.) When Petitioner showed up, they traveled to the rental car facility and exchanged the truck for another truck. (RT 398.) Fontaine stated he was with Petitioner all day until 10:00 p.m. (RT 398.) They had separated from around 2:00 p.m. until 2:30 p.m., but from 2:30 p.m. on, they were together. (RT 399.) At around 8:00 p.m., Fontaine testified Petitioner dropped him off at his home. (RT 400.) They then played video games. (RT 400-401.) Fontaine's girlfriend left the house around 8:45 p.m. to get food. (RT 401.) She returned around 8:45 p.m. (RT 403.) Petitioner had been sitting on the couch during this time. (RT 403.) Fontaine ate the food his girlfriend had brought him and continued to play video games. (RT 403.) At around 10:00 p.m., Petitioner left. (RT 403.)

Fay Dodson was Fontaine's girlfriend. (RT 426.) She testified Petitioner and Fontaine returned from Las Vegas on October 10. (RT 426.) On October 11, Petitioner and Fontaine showed up at her house around 8:30 p.m. (RT 432.) They were at the house playing video games until a little after 10:00 p.m. (RT 433.) Fay testified she left the house during that time for approximately 10 to 15 minutes to pick up food. (RT 434.) Fay stated she remembered the details of the 11th because she had attempted to order a Mike Tyson fight from the cable television company, but the company informed her the fight would not take place until the 15th. (RT 442.)

Ailey Foster was Fay Dodson's and Fontaine Sherman's friend and neighbor. (RT 572.) She knew Petitioner through them. (RT 572.) On October 10, she saw Petitioner and Fontaine arriving at Fay's residence in a white Ford pickup truck. (RT 572.) They were carrying large duffel bags. (RT 572.) On the evening of October 11, she went upstairs to find her neighbor Fay so they could go eat Chinese food. (RT 576.) At that time, she saw Petitioner and Fontaine sitting on the couch. (RT 576.) She then left with Fay to pick up Chinese food. (RT 577.) They were gone for approximately 15 to 20 minutes, and when they returned, Petitioner was still sitting on the couch. (RT 577.)

Petitioner's fiancée, Korrian Morrison, lived with Petitioner. (RT 445-446.) They had two children together. (RT 446.) She testified she had never seen Petitioner act violently toward anyone. (RT 446.) She further testified Petitioner came home on October 11 at around 10:45 p.m. (RT 450.) Fontaine Sherman also testified he had never known Petitioner to become violent toward him or anyone else. (RT 408.)

**Prosecution's Rebuttal**

Officer Madden testified he was contacted by Fontaine Sherman at the preliminary hearing in the parking lot during the lunch break. (RT 600-601.) Madden stated Fontaine told him Petitioner could not possibly have done the crime because Petitioner was with him in Vegas on October 11. (RT 601.) Fontaine did not tell Madden anything about the two of them playing video games at Fontaine's home during the time in question. (RT 602.)

The parties then stipulated that the Mike Tyson fight occurred on Friday, October 20, 2000. (RT 603.)

Sean Vose was the branch general manager of Enterprise Rent-A-Car in Bakersfield. (RT 604.) He testified with respect to two rental contracts involving Fontaine Sherman. (RT 607.) He stated Fontaine rented a white Ford F150 four-wheel drive truck on October 6. (RT 613.) He further stated Fontaine switched vehicles on October 18 and rented another white Ford F150. (RT 613.) However, a note handwritten by Sean Vose indicated the trucks were switched either on October 10 or October 16. (RT 629-630.) Sean Vose could not explain the discrepancies. (RT 630.) The contract further stated Fontaine did not have permission to drive out of state. (RT 612.) On October 20, Fontaine returned and closed out the first rental contract. (RT 614.)

## DISCUSSION

**I. Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Kern County Superior Court,

1  which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 2241(d).  Accordingly,

2  the Court has jurisdiction over the action.

3         On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

4  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

5  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114

6  F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert.*

7  *denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997)

8  (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was

9  filed after the enactment of the AEDPA; thus, it is governed by its provisions.

10 **II.  Legal Standard of Review**

11        This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

12 pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

13 Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

14        The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

15 Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70

16 (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the

17 adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable

18 application of, clearly established Federal law, as determined by the Supreme Court of the United

19 States" or "resulted in a decision that was based on an unreasonable determination of the facts in

20 light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,

21 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

22        As a threshold matter, this Court must "first decide what constitutes 'clearly established

23 Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

24 *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

25 must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

26 of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly

27 established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by

28 the Supreme Court at the time the state court renders its decision." Id.

1    Finally, this Court must consider whether the state court's decision was "contrary to, or

2    involved an unreasonable application of, clearly established Federal law." <u>Lockyer</u>, 538 U.S. at 72,

3    *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the

4    writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

5    question of law or if the state court decides a case differently than [the] Court has on a set of

6    materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 72.

7    "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

8    court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

9    applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413.

10    "[A] federal court may not issue the writ simply because the court concludes in its

11    independent judgment that the relevant state court decision applied clearly established federal law

12    erroneously or incorrectly.  Rather, that application must also be unreasonable." <u>Id</u>. at 411.  A

13    federal habeas court making the "unreasonable application" inquiry should ask whether the state

14    court's application of clearly established federal law was "objectively unreasonable." <u>Id</u>. at 409.

15    Petitioner has the burden of establishing that the decision of the state court is contrary to or

16    involved an unreasonable application of United States Supreme Court precedent. <u>Baylor v. Estelle</u>,

17    94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

18    Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

19    decision is objectively unreasonable.  <u>See</u> <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th

20    Cir.1999).

21    AEDPA requires that we give considerable deference to state court decisions. The state

22    court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's

23    interpretation of its own laws. <u>Souch v. Schaivo</u>, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537

24    U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

25    **III.  Procedural Default**

26    Respondent contends Petitioner has procedurally defaulted his claims by failing to timely

27    present them to the California Supreme Court.  Respondent points to the California Supreme Court's

28    citation to <u>In re Waltreus</u>, 62 Cal.2d 218 (1965), in the Courts' denial of Petitioner's state habeas

1    petition. See Exhibit E, Answer.

2         A federal court will not review claims in a petition for writ of habeas corpus if the state court

3    has denied relief on those claims on a state law ground that is independent of federal law and

4    adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 750 (1991). This doctrine

5    of procedural default is based on the concerns of comity and federalism. Id., at 730-32.

6         There are limitations as to when a federal court should invoke procedural default and refuse

7    to evaluate the merits of a claim because the petitioner violated a state's procedural rules.

8    Procedural default can only block a claim in federal court if the state court "clearly and expressly

9    states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989).

10        In addition, the state law ground must be independent of federal law. "For a state procedural

11   rule to be 'independent,' the state law basis for the decision must not be interwoven with federal

12   law." LaCrosse, 244 F.3d at 704, citing Michigan v. Long, 463 U.S. 1032, 1040-41 (1983); Morales

13   v. Calderon, 85 F.3d 1387, 1393 (9th Cir. 1996), quoting Coleman, 501 U.S. at 735 ("Federal habeas

14   review is not barred if the state decision 'fairly appears to rest primarily on federal law, or to be

15   interwoven with federal law.'") "A state law is so interwoven if 'the state has made application of

16   the procedural bar depend on an antecedent ruling on federal law [such as] the determination of

17   whether federal constitutional error has been committed.'" Park v. California, 202 F.3d 1146, 1152

18   (9th Cir. 2000), quoting Ake v. Oklahoma, 470 U.S. 68, 75 (1985).

19        Also, a federal court may only impose a procedural bar on claims if the procedural rule that

20   the state used is adequate to support the judgment. To be adequate, "the state's legal grounds for its

21   decision must be firmly established and consistently applied." King v. LaMarque, ___ F.3d ___,

22   2006 WL 2684539 *1 (9th Cir. 2006), citing Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir. 2003).

23   To be firmly established and consistently applied, the rule must be clear and certain. King, 2006 WL

24   2684539 *1, citing Melendez v. Pliler, 288 F.3d 1120, 1124 (9th Cir. 2002); see also Fields v.

25   Calderon, 125 F.3d 757, 760 (9th Cir. 1997) (The state procedural rule used must be clear,

26   consistently applied, and well-established at the time of the petitioner's purported default).

27        If the court finds an independent and adequate state procedural ground, "federal habeas

28   review is barred unless the prisoner can demonstrate cause for the procedural default and actual

1    prejudice, or demonstrate that the failure to consider the claims will result in a fundamental

2    miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S.

3    at 750; Park, 202 F.3d at 1150.

4          A denial and citation to In re Waltreus refers to California's procedural rule that "issues

5    actually raised and rejected on appeal cannot be renewed in a petition for writ of habeas corpus."

6    Forrest v. Vasquez, 75 F.3d 562, 563 (9th Cir. 1996), quoting In re Harris, 5 Cal.4th 813, 829 (1993).

7    In Ylst v. Nunnemaker, the Court concluded that a Waltreus citation is neither a ruling on the merits

8    nor a denial on procedural grounds thereby having no bearing on a petitioner's ability to raise a claim

9    in federal court. Ylst v. Nunnemaker, 501 U.S. 797, 805 (1991). Thus, federal court's must "look

10   through" the petition to the state court's prior decision and determine the grounds for the prior

11   denial. Id. at 803, 806; Forrest, 75 F.3d at 563-64.

12         However, if a claim was raised on direct appeal but not in a petition for review to the

13   California Supreme Court the court need not "look through" a denial because a citation to In re

14   Waltreus indicates a procedural bar to bringing the claim in federal court. Id. The Ninth Circuit has

15   reasoned that in these circumstances, the procedural bar results not from the violation of the In re

16   Waltreus rule barring claims raised and rejected on appeal, but from the failure to follow Rule 28(b)

17   of the California Rules of Court. Id. Rule 28(b) requires that a petition for review to the California

18   Supreme Court be filed within 10 days after the appellate court decision becomes final.

19         In this case, the California Supreme Court denied Petitioner's state habeas petition with

20   citation to In re Waltreus, 62 Cal.2d 218, 225 (1965), after Petitioner failed to timely present his

21   claims in a petition for review. See Exhibit E, Answer. Accordingly, Petitioner's claims were

22   defaulted under Rule 28(b). See Forrest, 75 F.3d at 563-64. Petitioner does not contend that the state

23   law ground was inadequate to support the state court judgment or that the state law ground was not

24   independent of federal law. Petitioner does allege there was cause for his procedural default. He

25   claims his appellate counsel was ineffective by failing to file a petition for review after the appellate

26   court's denial of his direct appeal. Petitioner claims appellate counsel was constitutionally obliged to

27   file the petition for review. In Douglas v. California, 372 U.S. 353 (1963), the Supreme Court held

28   that the Fourteenth Amendment guarantees a criminal defendant the right to counsel on his first

appeal as of right. However, this right does not extend to representation on a petition for review to the state supreme court. After the appellate court denied the direct appeal, appellate counsel's constitutional obligations to represent Petitioner ceased. It was Petitioner's duty to pursue a petition for review. Therefore, Petitioner has not demonstrated cause for his procedural default.

Furthermore, Petitioner has not shown that failure to consider the claims will result in a fundamental miscarriage of justice.  Accordingly, Petitioner has procedurally defaulted his claims. Nonetheless, the Court will address the claims as they are also meritless.

**IV.  Review of Petitioner's Claims**

**A.  Ground One**

Petitioner claims the trial court erred in refusing to grant Petitioner's motion for mistrial based on a prospective juror's comments regarding Officer Madden.

During voir dire, one of the prospective jurors claimed he had known Officer Madden quite well and for quite some time. (ART[3] 82.) The juror then stated he knew Officer Madden to be "a pretty fair guy." (ART 83.) The trial court then questioned the juror about his relationship with Officer Madden. (ART 83.) The court also inquired into the juror's ability to be impartial in the case. (ART 84-85.) The court then fully admonished the prospective jurors that they must be impartial. (ART 85.)

Defense counsel then moved for a mistrial based on the prospective juror's comment that Officer Madden was "a pretty fair guy." (ART 100.) Although the juror was ultimately excused with a peremptory challenge, defense counsel argued that the entire jury panel was tainted and biased by the prospective juror's positive opinion of Officer Madden's credibility. (ART 100-01.) The trial court denied the motion finding the jury panel had not been tainted. (ART 102-04.) The court was satisfied that the jurors had been extensively admonished that they must judge each witness independently and according to the same standards. The trial court also noted that the prosecutor had spent an extensive amount of time eliciting another juror's own negative experience with inappropriate methods used by an investigator for the District Attorney's Office. The court found no

---

[3]"ART" refers to the Augmented Reporter's Transcript on Appeal.

1   prejudice resulting from the juror's comment regarding Officer Madden. (ART 104.)

2         This claim was first presented on direct appeal to the 5th DCA.  The 5th DCA denied the claim

3   on October 1, 2001, in a reasoned opinion. See Exhibit C, Answer.  Petitioner did not timely present

4   the claim to the California Supreme Court in a petition for review; however, he attempted to present

5   it in a habeas petition. As previously discussed, the petition was denied as procedurally defaulted.

6   See Exhibit E, Answer. Although the California Supreme Court did not rule on the merits of the

7   claim, the 5th DCA did and found the claim to be meritless. Under the AEDPA, the 5th DCA's

8   decision is entitled to deference. See, e.g., McCain v. Gramley, 96 F.3d 288, 290 (7th Cir. 1996).

9         In rejecting the claim, the 5th DCA stated:

10        [W]e believe the trial court dispelled any possible bias the prospective juror's comment
          might have created in the minds of the other prospective jurors. (See *People v. Martinez,*

11        *supra*, 228 Cal.App.3d at pp. 1466-1467 [trial judge is in better position than reviewing court
          to gauge the level of bias and prejudice created by juror comments; conclusion of trial judge

12        on question of juror group bias and prejudice is entitled to great deference and is reversed on
          appeal only upon a clear showing of abuse of discretion].) In neither *People v. Medina,*

13        *supra*, 51 Cal.3d at pp. 888-889 [several prospective jurors made statements betraying a
          belief the defendant was guilty], *People v. Martinez, supra*, 228 Cal.App.3d at pp. 1468-1471

14        [prospective jurors made comments about the defendant's likely guilt, his language, the
          ineffectiveness of the criminal justice system, and the infallibility of police officers], nor

15        *People v. Nguyen, supra*, 23 Cal.App.4th at pp. 32, 40-42 [prospective juror made statements
          about supposed cultural practices of certain ethnic group], did the reviewing court find

16        reversible error in the trial court's decision not to discharge the entire venire on factual
          records in each of those cases considerably more aggravated than the factual record before us

17        in this case. If no mistrial was required in any of those instances, none is required here.
          Appellant makes no effort to discuss (or even cite) these cases or the principles of law they

18        articulate, and his argument is at base a conclusory assertion and assumption that the juror's
          remarks "poisoned" the entire panel.

19
    See p. 3, Exhibit C, Answer.
20
          When a jury is exposed to facts that have not been introduced into evidence, a defendant has
21
    effectively lost the rights of confrontation, cross-examination, and the assistance of counsel with
22
    regard to the extraneous information. Dickson v. Sullivan, 849 F.2d 403, 406 (9th Cir.1988), *citing*
23
    Marino v. Vasquez, 812 F.2d 499, 505 (9th Cir. 1987); see also Gibson v. Clanon, 633 F.2d 851, 854
24
    (9th Cir. 1980); Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir.1993) (introduction of extraneous
25
    prior bad acts evidence during deliberations constitutes error of constitutional proportions), *cert.*
26
    *denied*, 510 U.S. 1191 (1994). However, a petitioner is entitled to habeas relief only if it can be
27
    established that the constitutional error had a "substantial and injurious effect or influence in
28

1  determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 638 (1993). "If the trial judge

2  adequately cured the defect so that no actual prejudice resulted, the error is harmless and the

3  defendant is not entitled to the writ." Thompson v. Borg, 74 F.3d 1571, 1574 (9th Cir. 1996).

4          In this case, the trial court found no prejudice resulted from the prospective juror's statement.

5  In addition, the court extensively admonished the jury with respect to the impartiality required of

6  them. The appellate court also concluded the statement caused no prejudice to Petitioner. Likewise,

7  this Court concludes no prejudice resulted from the statement. There is nothing in the record which

8  would tend to show the statement had any effect on the venire. In addition, the trial court thoroughly

9  questioned the prospective juror, admonished the panel regarding their duty to be impartial, and

10  thereby dispelled any possible bias the statement could have caused. The trial court and the appellate

11  court were confident the statement caused no prejudice to Petitioner.

12          Petitioner has failed to demonstrate that the state court rejection of his claim was contrary to,

13  or an unreasonable application of, clearly established Federal law, as determined by the Supreme

14  Court of the United States, or a decision that was based on an unreasonable determination of the

15  facts in light of the evidence presented. See 28 U.S.C. § 2254(d). The claim should be rejected.

16  **B.  Ground Two**

17          In his second and final claim for relief, Petitioner contends there was insufficient evidence to

18  support the Forest Avenue verdict. He alleges only one witness made an attempt to identify

19  Petitioner as the perpetrator of the Forest Avenue crimes; however, this witness could not identify

20  Petitioner because the perpetrator's face was covered and not visible. In addition, Petitioner states

21  the witness selected someone other than Petitioner at the live in-person line-up.

22          This claim was also first presented on direct appeal to the 5th DCA.  The claim was denied on

23  October 1, 2001, in a reasoned opinion. See Exhibit C, Answer.  Petitioner did not timely present the

24  claim to the California Supreme Court in a petition for review; however, he attempted to present it in

25  a habeas petition. As previously discussed, the petition was denied as procedurally defaulted. See

26  Exhibit E, Answer. Although the California Supreme Court did not rule on the merits of the claim,

27  the 5th DCA did and found the claim to be meritless. Under the AEDPA, the 5th DCA's decision is

28  entitled to deference. See, e.g., McCain v. Gramley, 96 F.3d 288, 290 (7th Cir. 1996).

In rejecting the claim, the 5th DCA stated:

> There was sufficient evidence to support the convictions on counts 8 through 11 (the Forest Avenue incident) because there was other testimony corroborative of Smoke's testimony that appellant was the perpetrator of the Forest Avenue crimes. (Pen. Code, § 1111.) Jeanette, who had never seen appellant before the incident but spent 10 to 20 minutes with him in her apartment during the incident, identified appellant from a photographic lineup. She was sure of her identification, although she expressed her fear of testifying. She later failed to identify appellant from an in-person lineup, but she did identify him again at trial. Jeanette described the perpetrator as wearing a blue bandanna, but no hat. Vanessa did not identify appellant as the perpetrator, but she did describe the burgundy car. She described the perpetrator as wearing a blue bandanna and a hat.
>
> Although this other identification evidence was inconsistent in some particulars, it was enough to justify a jury's rational conclusion that Smoke was telling the truth. (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 25 [corroborating evidence may be entirely circumstantial; it may be slight and entitled to little consideration when standing alone; only a portion of accomplice's testimony need be corroborated, and corroborative evidence need not establish every element of the offense charged; all that is required is that the evidence connect defendant with the commission of the crime in such a way as may reasonably satisfy the jury that accomplice is telling the truth]; *People v. Cuevas, supra,* 12 Cal.4th at p. 265 [out-of-court identification generally has greater probative value than in-court identification made after suggestions of others have intervened; id. at pp. 271-272 [a single witness's out-of-court identification may be sufficient evidence to prove identity].)
>
> Furthermore, Jeanette's identification of appellant and Vanessa's identification of the burgundy car were not inherently improbable or factually impossible. (*People v. Allen, supra,* 165 Cal.App.3d at p. 623.)

See pp. 6-7, Exhibit C, Answer (footnotes omitted).

In reviewing sufficiency of evidence claims, California courts expressly follow the Jackson standard enunciated in Jackson v. Virginia, 443 U.S. 307 (1979). See People v. Johnson, 26 Cal.3d 557, 575-578 (1980); see also People v. Thomas, 2 Cal.4th 489, 513 (1992). Pursuant to the Supreme Court's holding in Jackson, the test in determining whether a factual finding is fairly supported by the record is as follows:

> "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).

Sufficiency claims are judged by the elements defined by state law. Jackson, 443 U.S. at 324 n. 16. This Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986). This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts. Tinsley v.

1  Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to

2  state court determinations of legal questions or mixed questions of law and fact, the facts as found by

3  the state court underlying those determinations are entitled to the presumption.  Sumner v. Mata, 455

4  U.S. 539, 597 (1981).

5       As argued correctly by Respondent, Smoke's testimony by itself was sufficient evidence of

6  Petitioner's culpability as the perpetrator. See United States v. Whitten, 706 F.2d 1000, 1007 (9th

7  Cir.1983), cert. denied, 465 U.S. 1100 (1984) (The uncorroborated testimony of an accomplice is

8  enough to sustain a conviction unless the testimony is incredible or unsubstantial on its face.);

9  United States v. Escalante, 637 F.2d 1197, 1200 (9th Cir.1980), cert. denied, 449 U.S. 856 (1980).

10 Her testimony was neither incredible nor unsubstantial on its face. In addition as discussed by the

11 appellate court, there was substantial corroborative evidence of Smoke's testimony and identification

12 of Petitioner as the perpetrator. Jeanette, one of the victims, identified Petitioner in a photographic

13 lineup and at trial. Victims Jeanette and Vanessa also described the blue bandanna, a hat, and a

14 burgundy car utilized by the perpetrator. This evidence corroborated Smoke's testimony. While there

15 were discrepancies in each witness's testimony, this did not render the evidence insufficient. The

16 reviewing court "must respect the exclusive province of the [trier of fact] to determine the credibility

17 of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts . . . ."

18 United States v. Ramos, 558 F.2d 545, 546 (9th Cir.1977). Any discrepancies could be challenged by

19 defense counsel on cross-examination. United States v. Ginn, 87 F.3d 367, 369 (9th Cir. 1996).

20 Clearly in this case, the jury took the discrepancies into consideration but believed Smoke's

21 corroborated testimony.

22      In sum, there was substantial evidence in the form of accomplice testimony, corroborative

23 eyewitness testimony, and circumstantial evidence from which the jury could have found beyond a

24 reasonable doubt that Petitioner committed the Forest Avenue crime. Thus, Petitioner has failed to

25 demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application

26 of, clearly established Federal law, as determined by the Supreme Court of the United States, or a

27 decision that was based on an unreasonable determination of the facts in light of the evidence

28 presented. See 28 U.S.C. § 2254(d). The claim should be denied.

1

**RECOMMENDATION**

2        Accordingly, IT IS HEREBY RECOMMENDED that the petition for a writ of habeas corpus

3   be DENIED. It is FURTHER RECOMMENDED that the Clerk of Court be DIRECTED to enter

4   judgment.

5        This Findings and Recommendation is submitted to the assigned District Judge, pursuant to

6   the provisions of Title 28 U.S.C. § 636(b)(1).  Within ten (10) <u>court</u> days (plus three days if served

7   by mail) after being served with a copy, any party may file written objections with the court and

8   serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's

9   Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10)

10  <u>court</u> days (plus three days if served by mail) after service of the objections.  The Court will then

11  review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised

12  that failure to file objections within the specified time may waive the right to appeal the District

13  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

14  IT IS SO ORDERED.

15  **Dated:    October 10, 2006**                          **/s/ Sandra M. Snyder**
16  icido3                                              UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28